Good morning, Your Honors, and may it please the Court. My name is Matt Ashley, and I'm counsel for plaintiff and appellant Tessera. This Court should reverse summary judgment because Tessera's proffered contract interpretation is at the very least reasonable, and it is also supported by credible and, in fact, compelling extrinsic evidence. I'm going to begin my argument today by touching on the language of the agreement, but I would like to focus most on some very compelling extrinsic evidence and the reasonable inferences that can be drawn from it, and that must be drawn from it, in Tessera's favor that I think compel reversal here. I would like to reserve three minutes for rebuttal as well. The governing contract is the license as amended. Are you looking at the 2002 amendment? Yes, Your Honor. Okay. Well, let's start with the 1999 one. Sure, Your Honor. For example, because after all, if that's not a royalty-based agreement, then it would seem unlikely that an amendment to it would be a royalty-based agreement. Why isn't the 1999 agreement a royalty-based agreement? If, Your Honor, do you, Your Honor, mean infringement-based? Yeah. Yes. I'm sorry, and the language. Not product-based. Not product-based. Not product-based. Not product-based, but patent-based is another way to put it. We're signing this agreement because you have patents. It says that describes the TCCs as, as. The subject matter of certain test or patent license. The subject matter of certain patents, and we're basically, I read that agreement, it screams out at me, we're signing this agreement, we're licensing this to you because otherwise we'd have a patent infringement claim if you, if you used our products. Is that fair? Yes, that is fair, and there's two questions bound up in that. The first. So, so, but let me just go back then to my first question. Is the 99 agreement before amendment a patent infringement-based agreement? No, Your Honor. And in fact, in fact, language that Toshiba proposed that would have expressly made it infringement-based, expressly made it infringement-based was rejected. Well, then, if, if it wasn't infringement-based, we've got this pub, this policy that says you generally shouldn't be getting royalties for something you don't have a patent on. That's actually not correct, Your Honor. Well, in general, in general, you think you can, you can demand royalties from someone for use of a product that's not patented? You can't demand royalties, so that's, that's, that's the issue. So why would they, why would they pay you royalties if there wasn't a patent-based claim? It's a negotiated deal. I'll give you an example, Your Honor, and I will go back to the 1999 agreement. Sure. The 2002 one has the same problem, issue, but if we start out, I mean, after all, if we start out with an agreement that's not, in your terms, patent infringement based, then it would seem to me the amendment to it probably wouldn't be an infringement based either. But my first reading of the 1999 agreement is it screams infringement-based. You've asked a lot of questions there, Your Honor. No, that's what the first question is, what is the 1999 agreement? I'll try to break it out. The 1999 agreement is not an infringement-based license. It does refer to the subject matter of the test for patents licensed hereunder. There is nothing in that language that requires that in order for a product to be royalty-bearing, that that product has to infringe the valid, and I'm putting that in quotes, the valid claim of a Tessera patent. That language was proposed and it was rejected. And you ask the question, why would a party who doesn't think its product infringes the valid claim of an existing patent agree to a portfolio license whereby it's still paying royalties, the best answer for that question is what Toshiba did with the Type IV packages. So the Type IV F micro BGAs is going to 2002. And by the way, F micro BGAs are 95 percent of the total royalties paid. So let me tell you the way I read the 2002 one, because you're going to put them together. I was going to rope back to you. You can respond to both of my questions at once. I don't think it's any disputed facts about what happened in 2002. They were using these four products. You said, hey, they're subject to our agreement. And we have patents on them. And they said, well, maybe you have patents on three, but we don't think you have a patent on the fourth. And you negotiated and you ended up with an agreement. If those are the facts, and those are, I think, pretty clearly undisputed in broad brush, why doesn't that make that a royalty-based agreement, an infringement-based agreement? Well, if it's an infringement-based agreement, that means the very day after the 2002 was amendment was entered into, Toshiba could take a product and say it does not infringe any patent, a Type IV product, because it's no valid claim of an existing patent. It would have resolved none of the disputes over the 1999 agreement. You can't reconcile. But it did resolve a dispute. It said we're going to treat these, it seems to me, as if they are patented products. We may still dispute that they are, but you say they are, so we will treat them as if they are. Yes. And Silport says that when you do that, when you have a stipulation that a definition in a contract is met, here, let's assume that subject matter of certain Tessera patents is what Toshiba claims it is, which is infringed the valid claims of an existing patent. Let's assume that.  And you've set forth a product description and say that description means that it fits the definition of what's royalty bearing. That is, by definition, a product definition-based license. Tell me what case says that. That's Silport. Doesn't it say that in a different context than this? Well, it actually did, because in this context, we contend that the term subject matter of certain Tessera patents does not mean infringement of a valid patent, because it is broader than that, and that language that was proposed was rejected. In Silport, there was no dispute that the contract did, in order to be royalty bearing, did contemplate there would have to be infringement. You're putting a lot of weight on the difference between subject matter and covered by, a lot of weight to carry a pretty significant load, which is to construe this licensing agreement to require a party that couldn't be compelled to pay royalties to continue to do so until the last of 37 patents has expired, which is a very long time. And it's not these four, it's not the patents at issue, it's not the movement patents that are specifically addressed in 2002, which, as you say, accounts for the lion's share. The 2002 amendment never references these movement patents, not by name, not by patent number. Sotomayor, I understand that, but it defines them to be patent covered. It never even references them. You're looking past the agreement into Toshiba's proffered extrinsic evidence. No, no. No, no, no. Look at the face of the agreement. The agreement says we wish to clarify whether these products are covered by the original. So I understand you argue the original agreement is not royalty based, but if it were, this language to me says we wish to clarify whether they're covered, they are covered, and then it sets forth a different royalty schedule than might have otherwise been applied. So doesn't this really depend on how we resolve the first question? I don't think it does. I really don't think it does. And, Your Honor, you are correct. We are putting a lot of stock in the reference to covered by. But then again, so is the Court in determining that it can't possibly be reasonably read. That's just one reasonable reading that covered by meant you had to pay royalties on it. And I have extrinsic evidence. Go ahead. Your course of conduct. This is important because this Court has said and the California Supreme Court has said that in interpreting a contract, actions speak louder than words. What we are not doing here is we are not interpreting a contract that was just entered into last year or that's for a one-off event like a sale of a car. We are interpreting a contract that has a course of conduct in excess of a decade. And what we know for a fact is that in 2010, Toshiba contends and its witnesses admitted that it did not believe it infringed the valid claims of any unexpired Chesser patent, period, in 2010. And yet, if you look at the royalty reports in the record. That was their position going into the 2009 negotiation. That is the old one. The 2002 negotiation. I'm sorry. Their position going in was we don't think you've got a patent claim, so go away. And you said, oh, yeah, we do. I mean, it's strange because you guys have switched sides in this debate. You know, they didn't think you had a patent claim, you did. Now you're saying it's not patent based and they say it is. But put that aside. In 2002, you said we have patents on these four products. And they said, no, you don't. But we'll get together and negotiate this deal because we don't want to have a patent infringement lawsuit brought against us. When he finishes his answer, may I ask my question? I'm sorry, and I've cut off Judge. No, go ahead, answer his question. But my point is that the fact that they later continued to have the same position that they had before they entered into the agreement doesn't demonstrate to me that they've somehow changed their views. Maybe I'm not articulating my argument clearly enough because what I'm talking about right now is conduct that's flatly contrary to their profit interpretation. $6.4 million worth of conduct. Yes, yes. In 2010 and thereafter, they are paying royalties when they don't believe they infringed the claims of any. Well, see, it's the – and I'm going to get – let Judge Hawkins go next. It's the don't believe that gives me trouble. In other words, the fact that they're paying royalties may be powerful extrinsic evidence. They never believed they were violating your patent. They didn't believe it in 2001. Well, then that would – that would counsel and favor. And you did. And you did. But Judge Hawkins, please ask your question. Your position is, on behalf of your client, as I understand it, is that the amendment is capable of two different interpretations and that it was inappropriate for the district court to, by summary judgment, in effect, saying Toshiba's version of what this contract means is correct. That's correct, Your Honor. That's correct. So if we were – if we agree with you and say that there are two reasonable interpretations to this language, the case goes back and it's tried, correct? Correct. Okay. What other facts would come into evidence that would support your side of the argument if it goes back? It goes back, full-scale trial, absent intervening motions of some kind or another. But what will come out that supports, to Sarah's point of view, on the interpretation of the amendment? Well, what will come out will include, but not be limited to, the payment history. I'm asking you for a list. Okay. So we have the royalty payment history. It's already in the record. Yes, but not mentioned by the district court at all in her ruling. No, and the district court may have – Judge Hawkins is asking you to assume the district court may have it. Well, outside of the record, what would come in outside of the record? No, he's asking you to – Mr. Hamill, let's say we agree with you. We say, okay, there are two reasonable interpretations of the amendment. It's ambiguous. And we're not – we can't on this record decide which is correct. It goes back for a full trial. What other than what's in our record will come forward in your opinion that would bolster to Sarah's side of the argument? The royalty-based stuff is already – the royalty history is already in the record. We already have it. Yes. So I don't know – if you're asking me what that we did not put in the summary judgment record, we'd put on witness testimony. We would put on Mr. Pickett, for instance, to say that he expressly crossed out infringement-based and cut – But that's in this record now. Yes, but the testimony – It may not make a difference, but he's asking a very specific question. Oh, I said testimony, live testimony. If we go to trial, maybe the jury will have to take inferences from the record that the evidence you've already put in. I think we – Is there going to be anything new? I think we submitted to the – I mean, obviously, there would be live witnesses to judge the credibility of. And presumably, Toshiba, because they haven't yet, Toshiba will put in on a witness to say why they were paying royalties in 2011 and in 2012 and in 2013 when it's their interpretation of this contract that as of 2010, the last to expire patent, the movement patent that they speak so much of – It's your case. They don't have to put anything in. You brought up the court – I think if they don't put in an explanation, Your Honor, of – to a jury, to a reasonable jury as to why their payment history doesn't jive with their contract interpretation, if they don't put that witness on and subject them to cross-examination, I think they'll lose the case in front of a reasonable jury. But that's a jury question. What we're really trying to figure out, and you still have an answer, is, is this all the evidence or is there other evidence that's out there that if there were a trial, a jury might hear? We would put on, for instance, this is in the second summary judgment that's before the Court, we would put on extensive evidence with respect to the auditor, for instance, that there were interchanges between Toshiba and the auditor, repeated interchanges on how it is to determine royalties and what's royalty-bearing status. But that's in this record. No, no, no. That's a very small part of it. There's a count up to progress. There were depositions – yeah, it's a very small part of it. And we will show in detailed and extremely detailed form that Toshiba's position in the case doesn't jive with what it was telling the auditors. Some of that was in the record, but not all of it was in the record. There are page limits. But most of the evidence – We've taken you over the time that you wanted to reserve. We'll give you some time for rebuttal, but why don't you sum up right now? Thank you, Your Honor. I'll reserve the rest of my time for rebuttal then. Fair enough. And we'll give you a couple extra minutes. Your position is that it's enough from Tessera's point of view at this stage in the proceeding, this is 54B, part of a larger enterprise, if you will, that it's enough to show that your client's interpretation of the amendment is equally plausible as theirs. That's correct. And if we come to that conclusion, we have to reverse summary judgment and send it back. That is correct, Your Honor. And before you sit down, because the 54B is on liability, in effect, in this case, right? In other words, what remains in the case, if we were – what the judge never got to were damages. He, in effect, said – That's correct. This is the way I interpret the contract. I don't have to get to damages. Right. There are other – there are other items of breach as well. Like, for instance, we allege they breached the audit provision in the contract, whereby actual determinations were made on how much they underpaid that they haven't yet paid. But you're correct, in connection with F micro BGA and our contract interpretation argument, that the judge did not reach damages. Okay. So either way it goes back. Either way it goes back. Thank you, Your Honor. Thank you. Good morning, and may it please the Court. Michael Hawes for the appellee, Toshiba, in this appeal. One thing I'll agree with, either way it goes back, there is more to do at the district court. So why should we do this at 54B now? We should do this because this is a major – there are two separate issues. There's the elephant in the room? There's – yeah, there's the audit issue, which is, you know, did the accountants get certain things right? And then there's the do we pay royalties after the patents expire for years and years and years after the patents expire? So when you compare those – So let me go back to the point your colleague raised, which I think is maybe his most powerful argument. You did pay royalties. $6.4 million. Years and years after the patents expired. Your explanation is we were stupid. I mean, I'm not you, I'm not any particular person. We, you know, it never occurred to us that we shouldn't be paying them. But he says, yeah, that's pretty good evidence that you interpreted the agreement as requiring them to be paid. Why isn't that a jury question? Your Honor, it's not a jury question because under California contract law, the first step Judge Freeman did, and it's the right step, is to say, is this language reasonably susceptible to the interpretation? But doesn't he have to consider that provisionally? Doesn't he have to consider the course of conduct? You provisionally accept the evidence, and you look at the evidence and you say, what is this relevant to? And is that a reasonably susceptible interpretation? So I have this agreement that's all in gobbledygook because it's written by all these skilled lawyers who negotiated something. Or not. And I look at it and say, gee, it looks to me like it's a royalty-based agreement, but I can't be positive. And one of the guys under the agreement kept paying royalties after the patents expired. Why isn't that a great jury question for me? If that first step is correct, it does, but that was not Judge Freeman's first step. Your Honor, I point you to the record at ER 176, lines 16 and 17, where she concluded the language of the agreement is not reasonably susceptible to the product-based construction. But did she provisionally accept the code of the course of conduct evidence in making that decision? So, Your Honor, you provisionally accept the evidence under California law to look at what interpretations.  The question is, did she provisionally accept it? And she did. It was in the hearing. We all discussed it. Yes. It was accepted. She, you know, if you look at her opinion, she didn't exclude anything. So it's all there. So tell us why, in light of that evidence, which would seem to cut the other way, the agreement is still susceptible of only one reading. So I'll do that, Your Honor, but there are two points to it. First, under Pacific Gas, you look at it based on the language. So let me do that first. And then second, I'll discuss that course of conduct evidence, because that is the California legal way of doing it. Yeah, no, we all understand that California does think differently than us. So let's start with the language. And as the judge did, she started like the parties did with the 99 agreement and said, okay, here's this agreement. It's licensing only patents. So the only thing that's coming to Toshiba is the ability to do something they couldn't do if there weren't these patents. Okay. So now she's looking at that agreement, and they submit extrinsic evidence to be considered provisionally that the parties discussed whether or not to be very much more specific in that 1999 agreement about linking it to patents and decided, ended up not doing it. What does that tell us? Under Pacific Gas, the first step, Your Honor, is you look at whether that's linked to an interpretation that the language of the agreements is reasonably susceptible to. So you don't take that into account in deciding whether that language is reasonably susceptible. You identify, here, I've got this extrinsic evidence, I've provisionally accepted it. What interpretation is the person offering it going to infer? What are they trying to say? Sotomayor, so let's assume we agree with you on the 1990 agreement. Okay. Because, really, we're not fighting about the 1990 agreement. We're fighting about the 2002 amendment. Why is the 2002 amendment not susceptible of more than one reading on this case? Provisionally accepting your course of conduct. When considering the course of conduct and all the extrinsic evidence. Yes, Your Honor. And here, I'd actually like to point you to the critical language that is relied upon by Tessera. So let's look at their opening brief, because I think there's a very important quote that you should look at on that. And if you have their opening brief, I don't know if you do before you. I do. We all do. Okay. Whether we can find it's a separate issue, but we all have it. I know there's different media involved, but if you could turn to page 31 of their opening brief, you can get at that. Go ahead. At the very bottom, you'll see, this is their chief language argument with regard to the 2002, right? They say, look, here's what the 2002 agreement says. It states that the purpose is to clarify that these F micro BGA packages are so covered and to assume. But tell me, stop there. Yeah. So doesn't refer back to anything there, does it? When I read the amendment, normally, you know, normally the preface doesn't say we have a dispute about whether they're covered by the 1999 agreement. This is to clarify that they are so covered. The words so covered just appear out of the air there. What does it refer back to? Well, it refers back to the structure of the 1999 agreement, which was a patent-based  So that's and there's a back payment as well, Your Honor. And Judge Freeman looked at that back payment and she said that means you were going back to this patent agreement. So fine. We go back to that patent agreement. Right. Toshiba apparently does not appreciate that the meaning of that agreement applied to the amendment, applied to these four packages, entitled it to stop paying royalties after 2010. It keeps right on paying. And what do we do with that course of conduct evidence that, in essence, it did not put its money where its mouth currently is? There are two things you could do with it, Your Honor. First, you could say to Sarah is not proffering an interpretation to which the contract language is reasonably susceptible. But your conduct. At that point, you don't consider the conduct. If it's put only behind an interpretation to which the language is not reasonably susceptible, that's the Pacific Gas case. It's been the law for 50 years. So if I have an agreement that says you will deliver me green widgets and I'll accept blue widgets later, does that modify the agreement? It does not modify the agreement, Your Honor. But in this case, why is the agreement? Actually, blue and green are pretty close. Maybe white and black, I would say, is not reasonably susceptible. Why in this case is the agreement only susceptible of one reading? Well, Your Honor, can I go back to that point in the brief? Because that was the language I wanted to point you to as to why it is only susceptible to that one interpretation. So can we do you have it? Sure. So it goes over onto page 32, and they quote, to establish a royalty due, dot, dot, dot, with respect to such F micro BGA packages. If that had been in the language in the agreement, this would be a very different case. But let's look at what they ellipsed out when they did that. And that's ER-460, which is the actual agreement. And I'll read you the words that they removed when they used those ellipses. The words they removed are the trigger for the royalty, and the trigger language is for licensees' exercise of its rights under the agreement. And agreement there is the capitalized A agreement, which is the bind. Scalia, E-460, just under the word scope. Do you see the word scope, Your Honor? The second line there, starting with the word for, for licensees' exercise of its rights under the capital A agreement. And if you look in the paragraph above, capital A agreement is the 99 agreement. So the language they removed is the language that says these royalties are because you're using the rights, which are these patent rights that they license. So there's a direct link between the royalties and the patent rights. So when they say, no, no, no, it doesn't matter if they're patent rights, it can be product-based, don't worry about the patents. They've actually ellipsed out the language that is directly contradicting their position. And that's why it's not reasonably susceptible. Sotomayor, Would you go back to something your colleague raised? Fisher, Sure. Sotomayor, He says, look, you guys fairly consistently during the process of this said you don't have a patent on at least the fourth. I have no idea what they call these products. When you use a shorthand, you shouldn't put Greek letters in them. Fisher, These are engineers we're dealing with, Your Honor. Sotomayor, Packages. Sotomayor, But the fourth patented product, your position all along was, somebody else has a patent on that, you don't. We shouldn't pay you anything on it. So, and now, but you agreed to pay them something on it. Why doesn't that make it a product-based? Fisher, It doesn't because, Your Honor, what was being debated was, do the patents cover it? Each party had its own position. So our choice is, go litigate it or come to an agreement. But what are we coming to an agreement about? We're coming to an agreement about the scope of the patent. Scalia, Well, but maybe you're coming to an agreement. Sotomayor, Covered by. Scalia, Maybe you're coming to an agreement that says, look, we're not conceding anything about the scope of the patent, but in order to avoid litigation, we'll agree to pay you royalties on these products. Why doesn't that why isn't that, why isn't this agreement subject to that interpretation? Fisher, Because of the very language I just pointed to, Your Honor, it links the royalty to the exercise of the license rights. The only thing we were licensed were those patent claims. There's nothing else that we were licensed. And those royalties are explicitly linked by the language in this agreement to our exercise of those license rights. So when we. Sotomayor, Do we merely conclude that you guys were stupid and you just kept paying? Fisher, No, Your Honor. You conclude that we had a business disagreement. We believe. Sotomayor, No, no, no. From 2010 to 2013. Fisher, So 2010 to 2013, the record shows that they asserted that there were other patents that hadn't expired that covered our stuff. Sotomayor, So the language of the 1999 agreement says this agreement extends to the point that the last patent covered expires. Fisher, The agreement does, Your Honor, but the royalties. Sotomayor, What do we do with that? Fisher, That means that after we stopped using their patents, we had the choice, if we wanted to, to introduce new products that used patents that were still around. Right? So we kept that right, but we don't have to pay royalties when we're not using  Sotomayor, So why didn't you? Fisher, Because we didn't they said you're using them, we said we're not. We were like let's try to work this out, we don't want litigation. Eventually we figure out we can't work this out, so we're going to, you know, we're going to stick with our position and stop paying royalties. Sotomayor, You're using patents other than the ones. Fisher, Exactly. There were two patents that they asserted that hadn't expired yet. We were back and forth about that. There were claim charts, all this stuff. And, you know, so at that point in time, yes, we had our position, but we don't know if we go into court whether we're 100 percent going to win. Scalia, If the agreement was subject to more than one interpretation, this would be extrinsic evidence that hurt you, would it not? Fisher, I think that a jury might. Scalia, At least potentially hurt you. Fisher, Yeah, we would give our explanation, they would give their explanation. Sotomayor, So your entire argument has to entirely be based on the notion that no matter what the extrinsic evidence, the language of this agreement is only subject to one interpretation. Fisher, I do make that argument, Your Honor, but I would say with regard to the code of conduct, that because there wasn't an agreement that these products were not covered, that this is not evidence of what the agreement means when they aren't covered, right? You had two parties saying yes and no. And we did a code of conduct. Sotomayor, Course of conduct. Fisher, And our course of conduct was in view of the fact that we had them saying you're infringing these other patents. We were saying no. So our course of conduct is not we agree there's no infringement and therefore we're going to pay. Our course of conduct was. Sotomayor, But a jury could take a different inference from it. But your argument is it doesn't matter, because even if a jury could take a different inference from it, the agreement, even in light of that evidence, is not susceptible of the other reading. Fisher, That's correct. So Judge Freeman. Sotomayor, So my question, I go back to it, it really does turn on your argument that the agreement is plain and unambiguous and susceptible of only one reading. Fisher, It turns on Judge Freeman's analysis to reach exactly that point, based on the meaning of TCC, based on billable PIN, and based on the language saying that this royalty is due based on exercise of patent rights. At some point, your client, based on its own internal deliberations and internal advice of counsel and the like, concluded to continue to make the payments. Correct? Fisher, Also taking into account what Tessera was saying, but yes. Breyer, Not under protest. Fisher, And then it's to finish my point. Sotomayor, In 2010, no protest. Fisher, I disagree, but I want to finish my answer. Breyer, Let Judge Hawkins finish. At some point in time, again based on internal deliberations and advice of counsel, et cetera, you came to the conclusion that you should stop making these payments. Fisher, Your Honor, we came to the conclusion that we should stop making the payments. I would agree. I mean, we did stop making the payments, so yes. Sotomayor, So at one point in time, you reached one construction of the agreement. Another point in time, you reached another construction of the agreement. How can we possibly accept summary judgment based on that? Fisher, So I disagree respectfully with the idea that we had two different constructions of the agreement. We always agreed it was infringement-based. The question was, is there infringement? So Tessera tells us, yes, you are infringing. We say, show us how. They send us some stuff. We do some technical analysis. We then decide, no, you're wrong. We're not infringing. Those decisions are not construction of the contract. Sotomayor, How much time elapsed between those two events? Fisher, Well, there was a lot of back and forth, Your Honor, but probably about a year and a half, I believe. I'd have to look back at the letters, a year and a half, too. Sotomayor, So you changed your mind not over what the language meant, but over whether your products were covered by the patent. Fisher, The ramifications of the infringement-based standard. Sotomayor, Is that the only possible interpretation that one can reach at that time? Fisher, I think it's the only reasonable interpretation, Your Honor. I can't say it's the only possible interpretation. Sotomayor, I accept your amendment. Sotomayor, Is there any extrinsic evidence that explains the flip from here's our money to we've been overpaying you since we've been paying you wrongly since 2010, give it back? Fisher, Your Honor, if you could look in the record at page ER543, that's our letter to the to Sarah saying, explaining we've had all these back and forths. You haven't shown it, and we've looked at it, and we've done the technical analysis. We're going to stop paying. And that's the letter that talks about that, Your Honor. And the one last thing I'd want to point out is Judge Freeman used the Pacific gas standard that says you exclude extrinsic evidence that doesn't correspond to an interpretation to which the contract is reasonably susceptible. Well, yeah, and that's a strange standard. You don't exclude it. It just doesn't change the – it just doesn't change your interpretation of the contract. Well, Your Honor, if you look at the exact language. I know Pacific gas says that, but it's a strange – you've got to look at it. You've got to look at it first to see whether it would change your interpretation of the contract, doesn't it, don't you? That's not – I don't think that's what it says. I think it says that you look at it first to figure out what interpretations it's relevant to. You decide if those interpretations are ones the language is reasonably susceptible to, and then if it's supporting interpretations that the language isn't reasonably susceptible to, you exclude it. It's provisionally admitted, then you exclude it. So Toshiba is, in effect, saying we were wrong about whether the products, in fact, infringed for 3 years. And now we want you to pay us back the money we paid based on the wrong assumption that they were covered by the patent and, therefore, our use would have been infringing. We changed our mind on that. I think the strength of evidence is we were wrong to pay you, but we didn't think it infringed, but we paid you because we wanted to come to a – if you – if we were wrong, you were going to come back to us, tell us we did infringe for whatever reason. We wanted to be able to work it out. You came back to us, you didn't have anything good. So we stopped paying you. Scalia. And I suppose whether you're entitled to the money back is an entirely different question. We'll get away from that. Fisher. Yeah. That's not on appeal, certainly. Scalia. They may be able to keep it even if you're right. Fisher. They may be able to, Your Honor. Judge Freeman will make that decision. Scalia. Okay. We've taken you over time, unless one of my colleagues has a question. Thank you. Fisher. Thank you, Your Honor. Scalia. And we'll put – we'll give you a couple minutes on the clock. I realize, sitting down there, that there is some additional evidence we would put on at trial, including the total royalties paid. As you know, we plucked from the summary judgment record the $6.4 million number, which is four out of 12 reports. I suspect that when we go to trial, we'll put in all the reports, we'll tally it up, and we'll show – so if you look at the ones from 2010, every one of them is FMICRO-BGA. There's a reason why. So this was 100 percent? A hundred percent from 2010 to 2013 was FMICRO-BGA for a reason. And we'll count it up at trial, and we'll show the total amount. And it's going to be way more than $6.4 million. So that's a piece of evidence we'd put on at trial. Let me ask you a question about that total amount. Is any of that – let's put it differently. Let's assume for a second that there was a dispute about whether other patents covered this. Would that payment have been made under that circumstance? I'm not sure I'm following the question. Sure. They say the reason we made these payments after the expiration of the patent is that you said other patents cover this. And so I guess my question is, is there a factual dispute about that? Well, there is a factual dispute. And what they're saying is attorney argument. There is no affidavit, declaration, deposition in the record. What about the letter that they've just sent? The letter was in November of 2013 after all the payments had been made. There's no contemporaneous evidence supporting their story. It would have been simple enough to put in a declaration saying, we were depending upon you agreeing to refund this if you didn't show patent infringement, and that's why we were making well more than $6.4 million. At the very least, a jury's entitled to weigh that inference. And, Your Honor – But you agree, but only if, in light of all that evidence, the 2002 agreement is subject to more than one reasonable – That's correct. But let's – let me give you a quote. Well, first of all, let me give you a cite to our brief where we discussed the conduct and payment cases and how exalted course of conduct is, even over the language of the agreement, because you're not interpreting the agreement the way the court thinks it was intended to mean. It's the way the parties actually intended. Here's my problem, and it's California-based, and I'll give you time to finish your argument. But Pacific Gas seems to say that course of conduct evidence really has two uses. First, we look at it as extrinsic evidence to see whether or not the language of the agreement is subject to more than one interpretation. But we get farther on down the road, and we're having a fight. You know, we survive summary judgment. It's really powerful stuff to bring in course of conduct. But doesn't – at the first stage, don't we still have to focus on the language of the agreement? Well, I'm not saying don't focus on it, but these agreements are not crystal clear, Your Honor. I mean, these – on some of these, we're splitting hairs, and this course of conduct evidence is overwhelming. So to give you an example, employers – Well, if they're not crystal clear, then we're done, aren't we? If they're ambiguous – That's right. Then you go back down – So we don't need your course of conduct evidence. Well, no, you always look at – If they're ambiguous, if they're subject to more than one interpretation, wholly putting aside your course of conduct evidence, summary judgment is inappropriate. That is true, Your Honor. But it doesn't mean that you don't use that course of conduct in helping to determine whether or not the contract can be interpreted in the way the nonmoving party is proffering it. We're interpreting the 2002 amendment exactly as Toshiba performed it. If we interpret the 2002 amendment as saying it's still infringement-based, patent-based, and send it back, affirming the district court's interpretation, send it back, is there a factual dispute that the parties will then try as to whether the four packages did infringe from 2010 to 2013? Or do the parties agree that, in fact, they didn't? I don't think we've done that analysis because one of our claims is that Toshiba has not shared secret processing information that it's required to under the agreement. It's one of the claims that remain to be tried. So it's very difficult for us to do a pure infringement-based analysis without knowing all the processes. So are you saying that 54B, if we affirm, wouldn't resolve the dispute of infringement? Or where the money is owed, whether it's owed at all. That is, it's not a foregone conclusion that if we affirm the district court, you are out $6.4 million. Rather, it goes back to the district court, and the district court then allows you to conduct discovery in two and have a trial, if necessary, on whether there was, in fact, infringement during that three-year period. I think it's Tessera's position, Your Honor, that this is not an infringement-based license. So — Well, I understand that. But let's assume we say you're wrong. Yeah. Honey, you got it wrong. You're going back. What is it that's going to happen when you go back? It's hard for me to predict precisely how the trial is going to lay out. It doesn't sound like you're out of the woods. It sounds to me like you still have a strong argument of the ability to conduct discovery into and developed disputed facts if you are able to do so, material to determining whether, in fact, infringement occurred during those three years, triggering an obligation to pay the royalties. Well, we think that those paid royalties, the $6.4 million is to show that there are contract interpretations not consistent with their conduct. We think that St. Regis, by this Court in Bristol-Lochnutt, completely preclude any ability for Toshiba to get a refund after the fact. They didn't pay those under protection. That's not what I'm asking. I'm misunderstanding the question. But I do want to leave you with this, Your Honor. We cited authority on pages 37 through 45 of our brief on the importance of payment history in the context of interpreting a contract. Well, I'm not discounting payment history. That's my question. My question would take into account payment history, but it would take into account payment history and course of conduct in determining whether, in fact, there was infringement, which you haven't yet even conducted discovery into, as opposed to whether the contract required payment even if there wasn't infringement. Yes, Your Honor. That's the difference. Well, I think the discovery is closed currently. I mean, discovery was completed, and then we had summary judgment. We're in the midst of expert reports. I guess what all these questions lead me to, we don't have to take a 54B, do we? Can we say to the judge, boy, there's a lot left to be done in this case. You shouldn't have certified this issue to us. I don't know that I would ever tell the Ninth Circuit what it has to do. I do think that you have recently pronounced that the Ninth Circuit has the substantial deference that's afforded the district court's determination. Right. But it's not a final – to put it differently, the district court's 54B is not binding on us. That's correct, Your Honor. We could conclude that stepping into the mess, if you will, at this time is – would be inappropriate. Premature. Premature. Too hard. You could conclude that, but I will say that I do think that the district court would reach a different conclusion. But if we do conclude that, you win. Not necessarily. Here, on this – on this case. We send you all back, let you try the case, let you finish up the case, and we have a judge – we have a complete final judgment, and then we can say, oh, she was right on this partial summary judgment or she was wrong on it. Well, there's a problem – the problem with that, Your Honor, and this is why the If you let it stand, it will be bootstrapped into the remaining rulings in the case. It will hamstring us based on decisions we made in connection with discovery. You see that as the ballgame. Because you can't prove that it infringed. That's correct, Your Honor. That's correct. Could you make an argument that the court should allow you now to conduct discovery into that since you have this course of conduct evidence that apparently Toshiba thought it infringed? Something infringed. Or thought they owed it regardless of whether it infringed. I think – I think that – Okay. I'm putting that aside for a moment. Putting that aside. We can maybe make the argument, Your Honor, yes. Well, I think you've made the argument, and I want to thank both sides. This is a very interesting case. It's really a terrific case. You've both been very helpful, and we will take it under submission. And with that, we will be in recess for the day. Thank you. All rise.
judges: Hawkins, Hurwitz, Rosenthal